[Civ. No. 33379. Second Dist., Div. Five. Feb. 25, 1970.]

DOROTHY RICKLESS, Plaintiff and Respondent, v.
HUBERT A. TEMPLE, Defendant and Appellant.

COUNSEL

Harris K. Lyle and Edward L. Lascher for Defendant and Appellant.

Richards, Watson & Hemmerling, Gilbert Dreyfuss and Robert L. Hitchcock for Plaintiff and Respondent.

OPINION

**FRAMPTON, J. pro tem.**\*—

### Statement of the Case

Plaintiff, by her second amended complaint, as superseded by pretrial statements and orders, on which the cause went to trial, sought, in the first cause of action therein, to have a deed executed by her on certain real property situated in the City of Santa Monica to defendant, declared to be a mortgage given to secure a loan of $20,000; to have the court determine the amount justly due on such loan and to permit her to deposit that amount with the clerk of the court for the benefit of the defendant; that upon such deposit, she be granted a decree quieting her title to the real property and requiring the defendant to execute and deliver to plaintiff a proper deed to such property.

The second cause of action was based upon an alleged conspiracy between the defendant and others to obtain large sums of money, as well as the real property described in the first cause of action from the plaintiff by means of false and fraudulent representations and pretenses. Plaintiff prayed for general and exemplary damages under the second cause of action.

Judgment was rendered in favor of the plaintiff and against the defendant on the first cause of action decreeing that the deed was a security instrument, that plaintiff was not indebted to defendant in any amount, that she was entitled to receive the defendant's interest in an account held by the Mutual Savings and Loan Association, and that she have a money judgment against defendant in the sum of $20,539.81, plus interest thereon from November 2, 1962, in the amount of $7,316.61, and costs of suit. The court found against plaintiff on the second cause of action. The appeal is from the judgment. Plaintiff has not appealed from the judgment so that portion of the case bearing upon the second cause of action is not before

---

\*Retired judge of the superior court sitting under assignment by the Chairman of the Judicial Council.

the court. The case will be reviewed, therefore, as though it was here only on the first cause of action.

The briefs are divided for convenience into two major attacks upon the judgment. The first relates to an attack upon the alleged abuse of discretion of the trial court in denying the defendant's motion to dismiss the action pursuant to the provisions of section 583, Code of Civil Procedure. The second is directed to a reversal of the judgment on the basis of claimed substantive errors. If it is shown that there was a manifest abuse of discretion with reference to the denial of the motion to dismiss for failure to timely prosecute the action, that would dispose of the appeal and would render discussions of the claimed substantive errors unnecessary to the decision. (Cf. *California Employment Stabilization Com.* v. *Guernewood Park Resort & Tavern,* 70 Cal.App.2d 245, 246-247 [160 P.2d 581].) In these circumstances we will first discuss the matter of the denial of the motion to dismiss pursuant to section 583.

### Order Denying Motion to Dismiss

The chronology of the events leading up to the making and the denial of the motion to dismiss is as follows:

| Date | Event |
|---|---|
| 12/22/61 | Complaint filed |
| 1/16/62 | Twenty-five days later demurrer to complaint filed |
| 1/23/62 | Demurrer to complaint overruled—15 days to answer |
| 2/21/62 | First amended demurrer to complaint filed and answer filed |
| 2/23/62 | Plaintiff's objection to first amended demurrer filed |
| 3/29/62 | Minute order of court treating objection to first amended demurrer as motion to strike and setting hearing on motion for April 10, 1962, also granting plaintiff leave to file amended verified complaint prior to such hearing |
| 4/10/62 | Motion to strike first amended demurrer off calendar, plaintiff granted leave to file amended verified complaint within 20 days |
| 5/1/62 | First amended complaint filed |
| 5/9/62 | Demurrer to first amended complaint filed |
| 5/16/62 | Hearing on demurrer to first amended complaint continued from 5/16/62 to 5/29/62 |
| 6/8/62 | Demurrer to first amended complaint sustained |

| Date | Event |
|------|-------|
| 6/25/62 | Second amended complaint filed |
| 8/24/62 | Notice of motion to compel defendant to answer questions at deposition hearing |
| 9/11/62 | Motion to compel answers continued at request of defendant from September 11, to October 8, 1962 |
| 10/8/62 | Motion to compel answers granted upon resumption of deposition on 10 days' notice |
| 4/2/63 | Answer to second amended complaint filed |
| 4/5/63 | Plaintiff's memorandum for setting trial filed |
| 2/7/64 | Court set pretrial conference for May 4, 1964 |
| 5/4/64 | Pretrial conference continued to June 18, 1964 |
| 6/18/64 | Pretrial conference off calendar |
| 7/12/66 | Plaintiff notices motion to be heard July 22, 1966, to advance pretrial and trial to avoid bar of section 583, Code of Civil Procedure |
| 7/22/66 | Motion for early setting continued to August 5, 1966 |
| 7/22/66 | Defendant's motion to dismiss for failure to bring action to trial within two years filed |
| 8/3/66 | Motion to dismiss denied |
| 8/5/66 | Motion for early pretrial and trial setting granted—pretrial set for September 19, 1966 |
| 9/19/66 | Pretrial held, trial date set for December 19, 1966 |
| 12/14/66 | Notice of motion to amend plaintiff's pretrial statement and pretrial order filed, amendment to order filed |
| 12/19/66 | Trial date continued to December 20, 1966, due to congested calendar |
| 12/20/66 | Plaintiff's motion to amend pretrial order granted, trial commenced |

The declaration of Gilbert Dreyfuss, a partner in the law firm representing the plaintiff, in opposition to the motion to dismiss, sets forth the following facts bearing upon the delay in bringing the action to trial:

"2. This action was originally brought on December 22, 1961, against

defendant Hubert A. Temple, Mutual Savings and Loan Association and Gonzalo Jiminez. We have determined that Gonzalo Jiminez is a domiciliary of Mexico unavailable for service and thus not subject to the jurisdiction of the California court.

"3. After the sustaining of demurrers, an answer to the second amended complaint was filed by the attorneys for defendant Temple. This action is one, first, to redeem and quiet title to certain property previously owned by the plaintiff and conveyed to defendant Hubert Temple. Plaintiff contends that this deed was intended to be a security instrument. Defendant Temple borrowed money from defendant Mutual Savings and Loan Association and gave as security a deed of trust on the property in question. Mutual Savings and Loan Association was served as a necessary party and a Lis Pendens filed.

"4. Subsequent thereto, it was agreed between the parties by written stipulation dated September 11, 1962 and filed with the court September 13, 1962, titled 'Stipulation Re Effect of Lis Pendens' under and pursuant to which it was agreed that the property be sold and the proceeds be used to pay the indebtedness in favor of Mutual Savings and Loan Association, to pay taxes and expense of sale, with the balance held by Mutual Savings as an escrow holder. No further action is required, therefore, against Mutual Savings as a defendant except to direct Mutual Savings to whom the balance of funds should be disbursed.

"5. The second cause of action is for damages for fraud against Mr. Temple, on the theory that he, acting in concert with other persons, including one Ricardo de Escamilla, did, by making false and fraudulent misrepresentations to the plaintiff, induce her to convey the property to Temple as security for a loan from Temple to de Escamilla, on which loan Mr. de Escamilla has completely defaulted. Plaintiff alleges that defendant Temple and de Escamilla and the other persons were co-conspirators and each and every one of them knew that de Escamilla had no intention of paying the money, to her damage in the amount of the value of the property.

"6. After a good deal of time in the law and motion departments of the court, defendant Temple filed his answer on April 2, 1963, denying all the allegations. Defendant Temple's deposition was taken, concluding in November of 1962, during the course of which deposition he denied any knowledge of the allegations of the complaint insofar as misrepresentations were made to the plaintiff by him or by Mr. de Escamilla with Mr. Temple's knowledge. The plaintiff had no direct dealings with Mr. Temple, but only with Mr. de Escamilla who, therefore, will be a material witness for plaintiff in the successful prosecution of this action.

"7. Prior to filing of the instant action, plaintiff had on file Action No. 776 047, Rickless v. de Escamilla, et al. Mr. de Escamilla and other defendants in that action stipulated that judgment be entered against them. Subsequent to the filing of that action, certain information came to the attention of the plaintiff which caused her to believe that Mr. Temple, not previously named as a defendant, was implicated in certain activities which fraudulently deprived her of her money and property. The complaint was therefore amended to serve Mr. Temple as Doe One. Subsequently, on December 5, 1961, by service of subpoena, an attempt was made to take Mr. de Escamilla's deposition, but his attorney, James O. Ball, of the firm of Ball, Yudelson, Brown & Di Giuseppe (and Mr. Di Giuseppe is counsel for defendant herein), instructed him not to answer any questions. That same day Mr. Escamilla, by a substitution of attorneys, became his own attorney in pro. per.

"8. The matter was prosecuted through the discovery department of the Superior Court in an attempt to make Mr. de Escamilla answer questions. During the pendency of the motion to compel answers, our law firm, acting under the well-founded fear that Mr. de Escamilla might leave the jurisdiction, filed the instant action against Mr. Temple. Demurrers on the ground of another action pending were filed, and overruled by the court.

"9. On February 2, 1962, the Honorable Philbrick McCoy denied the motion to compel Mr. de Escamilla to answer questions in a deposition in Action No. 776 047. By that time, Mr. de Escamilla had left the United States and was no longer subject to the jurisdiction or subpoena power of the California courts.

"10. Investigators hired by our office conducted an extensive and intensive investigation both here and in Mexico and determined that Mr. de Escamilla was in fact residing in Mexico, in either Agua Calientes or Puerto Vallarta. We also determined that he did make periodic short trips into California, but that these were unannounced and unscheduled and that we could not properly anticipate when Mr. de Escamilla would be in California to be served with a subpoena to take his deposition.

"11. On February 8, 1966, we were advised that Mr. de Escamilla had filed bankruptcy in the United States District Court in the Southern District of California, and had listed plaintiff as a creditor. A creditor's claim was filed with the bankruptcy court, and on April 14, 1966, the first hearing for the benefit of creditors was held. I attended that hearing on behalf of the plaintiff and interrogated Mr. de Escamilla under oath. Subsequently, we filed specifications to objections of discharge and have been advised that the hearing on Mr. de Escamilla's discharge from bankruptcy will be heard on September 22, 1966. On that date he will be

available and subject to the subpoena power of the court for taking of his deposition for the first time. On July 11, 1966, my associate, Mr. Robert L. Hitchcock, filed a notice of motion to advance setting of the pretrial and trial dates of this case.

"12. Absent the testimony of Mr. de Escamilla, we would have previously been unable to proceed to try this case, but now that he is available again, we can move ahead. We were unable to bring this case to trial before this date because of the voluntary unavailability of a witness who is not only material, but crucial.

"13. As noted in Paragraph 4, hereinabove, a stipulation titled 'Stipulation Re Effect of Lis Pendens' was entered into between the plaintiff and defendant, through their counsel, filed with the court on September 13, 1962. Said stipulation provided in part as follows: '4. That upon the completion of said sale, the proceeds from the sale of said property shall be paid to Santa Monica Bank, as escrow holder (Escrow 2—16163-T), and that said escrow holder shall thereafter apply the same for the following purposes: (a) To pay the existing indebtedness, secured by a deed of trust of record, in favor of Mutual Savings and Loan Association; (b) To pay taxes and expenses of sale, including commissions and escrow charges; and (c) To pay the balance to Mutual Savings and Loan Association, for the use and benefit and account of the parties hereto, namely, Hubert A. Temple and Dorothy Rickless, as their respective interests may appear, *either by virtue of their joint written order for the disbursement of such funds directed to said Mutual Savings and Loan Association or by virtue of a final judgment in the above action* (not stayed by a *supersedeas*), whichever shall occur sooner.' [Italics supplied].

"14. It is the plaintiff's contention that all of the funds held by Mutual Savings are the property of plaintiff. Plaintiff further claims that additional sums are due from the defendant to plaintiff. Plaintiff and defendant have not heretofore entered into any 'joint written order for the disbursement' of the funds held by Mutual Savings. Accordingly, the disposition of such funds would await a final judgment in this action. Any dismissal of this action without a trial on the merits will not determine the ownership of the funds held by Mutual Savings, which are estimated to be approximately $16,747.53 as of June 30, 1966."

The facts related in the Dreyfuss declaration were not challenged by conflicting declarations or affidavits.

 "The general rule is that the disposition of a motion to dismiss an action for want of prosecution rests in the discretion of the trial court, and that its action on such motion will not be disturbed here unless such discretion has been grossly abused. [Citation omitted.]" (*Grass* v. *Rindge Co.,* 84 Cal.App. 750, 763 [258 P. 673]; cf. *Preiss* v. *Good Samaritan Hospital,*

171 Cal.App.2d 559, 564 [340 P.2d 661].) ■ If there is a valid or reasonable excuse for delay in prosecuting the action, then to dismiss under the discretionary provisions of section 583, Code of Civil Procedure, is an abuse of discretion. (*Jepsen* v. *Sherry,* 99 Cal.App.2d 119, 122 [220 P.2d 819, 822].) ■ "[S]ection 583 is not to be construed to require the plaintiff to proceed with a wasteful, abortive trial upon the peril of losing his day in court; such an application of the statute induces an abhorrent sacrifice and partial destruction of the judicial process." (*Vecki* v. *Sorensen,* 171 Cal.App.2d 390, 396-397 [340 P.2d 1020].)

■ The uncontradicted declaration of Dreyfuss, plaintiff's counsel, to the effect that plaintiff required the testimony of de Escamilla in order to prove her case, that she was prevented from obtaining his deposition by the action of defendant's counsel, and that she was unable to obtain jurisdiction over the witness for the purpose of obtaining his testimony until shortly before the motion to advance the pretrial and the trial was filed (July 12, 1966), was before the court. If plaintiff could not establish her case without the testimony of de Escamilla, it would have been a study in futility for her to proceed to trial while he was in Mexico, unsubpoenaed and undeposed. We find no abuse of discretion, under the circumstances here shown, in the court's denial of the motion to dismiss.

### Statement of Facts

Plaintiff had been elected a director and officer of Cal World Agency, Inc. (hereinafter "Cal World")[1] on May 20, 1961, approximately three and one-half months after she first heard of that business, or met any of its principals, or the defendant. In those three and one-half months she had invested in the Cal World business a total of $92,306, although no permit had been requested of, nor issued by, the Commissioner of Corporations and no stock had been issued to anyone.

The first week of June 1961, plaintiff was approached by Mr. de Escamilla, the president of Cal World, who asked her to guarantee a proposed loan to Cal World from the Bank of America for $50,000. She did so; however, the bank only loaned $25,000 of the $50,000 requested. The $25,000 borrowed was used in the Cal World business.

After the plaintiff had guaranteed the loan from the Bank of America, Mr. de Escamilla informed her that an additional $20,000 was needed for Cal World because of investigations by the Labor Commissioner and

---

[1]Cal World Agency, Inc. appears to have been an organization which functioned generally in the nature of a parent company which franchised businesses all bearing its name and all engaged in the employment agency business in connection with domestic help.

attorney's fees. She told Mr. de Escamilla that she had no further cash. Mr. de Escamilla suggested that she borrow on her unencumbered lot in the City of Santa Monica, which she had purchased on December 9, 1960, for $31,000.

The main office of Cal World was on Hamlin Street in Van Nuys, in the same building in which defendant had his office, and in which the law firm of Ball, Yudelson, Brown and Di Guiseppe, attorneys for Cal World and defendant, had their offices. Defendant was a builder familiar with the financing of real property, a licensed contractor, and a real estate broker.

Mr. de Escamilla asked the defendant if he could arrange a loan on plaintiff's lot. The defendant was told that money was needed for expansion of Cal World and that plaintiff wanted to borrow some money on her Santa Monica lot because she was going to put another $20,000 into Cal World.

Mr. de Escamilla told the plaintiff that the defendant could arrange a loan on the Santa Monica lot, and she called the defendant on the telephone to discuss the possibilities of obtaining such a loan. She asked him how much he thought she could borrow on it. He asked her how much she had paid for it, asked her for the address, and said he would send someone over to appraise the lot.

Several days before June 9, 1961, the defendant called Home Savings and Loan Association to see what could be borrowed on the property on behalf of the plaintiff, but was unsuccessful in obtaining a loan from that source. The defendant then called Leroy C. Erickson, vice-president of Mutual Savings and Loan Association of Pasadena (hereinafter "Mutual") and discussed the possibility of a loan with him. The precise date of this conversation is not shown, but it appears that it probably took place not later than Friday, June 9, 1961, or prior thereto. Mr. Erickson, in that conversation agreed, on behalf of Mutual, to lend $20,000 secured by the Santa Monica lot with interest at 6.6 percent.

It was prior to June 9, 1961, that Mr. de Escamilla called the plaintiff at the Beverly Hills office of Cal World, and told her that the amount that could be borrowed on the lot was $20,000. She told Mr. de Escamilla that she was surprised that this sum was all that could be borrowed. Mr. de Escamilla made that call from the office of the defendant, and in the background plaintiff could hear the defendant ask Mr. de Escamilla to get the lot number and all the details on the lot.

On Friday, June 9, 1961, Mr. de Escamilla brought four documents to plaintiff at the Beverly Hills office of Cal World: a grant deed from plaintiff to defendant; a promissory note from Mr. de Escamilla to plaintiff in the principal amount of $23,000; a check from the defendant to plaintiff in the amount of $20,000, and a letter from defendant to plaintiff which pro-

vided as follows: "This is to reconfirm our agreement that I shall deed to you Lot P in block 44, Santa Monica, as per map recorded in Book 3, Pages 80 and 81 and in Book 39, Page 45, E.T. SEQ of misc. records in the office of the county recorder of said county, anytime within six (6) months from date [June 9, 1961] upon the payment by you to me of $23,000.00."

The typed documents above mentioned had been prepared in the defendants' office by his secretary, Linnette Evans, including the note from de Escamilla to plaintiff.

Plaintiff testified that she was shocked that she was being asked to transfer the property outright to the defendant, but she was told by Mr. de Escamilla that this would enable the defendant to negotiate the loan more quickly. Mr. de Escamilla pointed to his note to her for $23,000, and said that when he paid the plaintiff the $23,000 mentioned in the note, she could give the $23,000 to the defendant; defendant would then return the property. Plaintiff asked why the amount that would have to be paid to the defendant was $23,000 if the loan was for $20,000 and Mr. de Escamilla said that it was for costs, et cetera.

During the meeting with de Escamilla, plaintiff telephoned the defendant and asked him why there was a grant deed. The defendant told her it was a quick way of getting the money and that when she paid him the $23,000, he would deed the property back to her. She told the defendant that by signing the deed "the property is no longer mine," and the defendant replied that she should not worry, the property was not his, his letter covered it, and that he would deed the property back to her when he received the $23,000. Mr. de Escamilla said he was guaranteeing the return of the money to pay for the property.

Plaintiff signed the grant deed and endorsed the defendant's check in blank. Mr. de Escamilla then left, taking with him the check and grant deed, and leaving with the plaintiff his note and the letter from the defendant.

On Monday, June 12, 1961, Mr. de Escamilla deposited the defendant's check in his (de Escamilla's) personal bank account at the Bank of America in Van Nuys. On the same date the defendant delivered the grant deed from the plaintiff to Title Insurance and Trust Company for recordation with an accommodation request, filled out at the office of the title company, signed by the defendant, which requested the title company to record the deed and affix $38.50 worth of revenue stamps thereto. The deed was recorded in accordance with the written request. The defendant knew that revenue stamps were required at the rate of $1.10 per one thousand dollars of valuation. Revenue stamps in the amount of $38.50

would indicate that the defendant had purchased the property for the consideration of $35,000.

On June 12, 1961, the defendant went to the Glendale office of Mutual and signed the necessary documents to obtain a loan of $20,000 on the Santa Monica lot. The loan had been approved prior to that day; all of the documents were signed on June 12, and the documents would have been prepared only after approval of the loan by Mutual's loan committee.

On Thursday, June 15, 1961, the escrow for the Mutual loan closed. The funds were disbursed on Friday, June 16, and were deposited in the defendant's bank account on the following Monday, June 19, 1961. The net amount of the proceeds received by the defendant from Mutual was $19,258.80. The loan was for one year with interest at 6.6 percent, payable quarterly.

Although a title policy was issued to Mutual through its escrow, no title policy insuring the defendant was ever issued, nor did the defendant obtain a preliminary title report.

No taxes were prorated between the plaintiff and defendant. The plaintiff had previously paid the second installment of property taxes on the lot for the fiscal year 1960-61, and thus had paid the taxes for the period June 9 to June 30, 1961. In December 1961, the plaintiff paid the first installment of property taxes on the lot for the fiscal year 1961-62. After June 9, 1961, the plaintiff paid her gardener to work at the Santa Monica property.

The defendant had caused revenue stamps to be placed on the deed evidencing a value of $35,000 for the property, but testified that he was satisfied to acquire it for $20,000 if plaintiff did not pay him the $23,000.

The loan escrow with Mutual closed on Thursday, June 15, 1961, and the proceeds were paid to the defendant on Friday, June 16. This was the Friday preceding Father's Day. The defendant and Mr. de Escamilla had arranged to fly together to Puerto Vallarta, Mexico. Plaintiff drove Mr. de Escamilla to the airport. At the airport Mr. de Escamilla received a telephone call from the defendant stating that the latter could not make it because of Father's Day, and he could not leave his children.

On the way to the airport, Mr. de Escamilla told the plaintiff that Cal World was having trouble with the Labor Commissioner, who was threatening to revoke the employment agency's license. During the trip to the airport, Mr. de Escamilla told plaintiff that he had been advised by his attorney, Mr. Ball, to tell her that he had a prison record, but held a full pardon. Mr. Ball had given this instruction after having found out that plaintiff had advanced money to the corporation. An attorney from the

Labor Commissioner's office had advised Mr. Ball of Mr. de Escamilla's criminal record.

On Wednesday, June 21, 1961, after Mr. de Escamilla returned from Mexico, a meeting was held at Cal World by its officers and directors. The mounting problems of Cal World were discussed. They discussed the method by which the employment agency license of Cal World could be maintained and not revoked. At the meeting, with Mr. Ball present, it was suggested that the license might be transferred to the plaintiff since her record was "clean." Plaintiff stated that she was not interested in having the license transferred to her.

During the meeting of June 21, 1961, Mr. de Escamilla left the room for a time. When he returned he had what appeared to be a check which he held out saying, "Look what Hugh gave me to send down to Mexico."

On June 21, 1961, and prior to the meeting just described, Linnette Evans, defendant's secretary, had gone to the Bank of America at Van Nuys and obtained a cashier's check for $20,000, payable to the defendant, purchased with funds from the personal account of Mr. de Escamilla that had originated with the defendant and which had passed through the plaintiff's hands.

The Van Nuys branch of the Bank of America is approximately three blocks from the Hamlin Street address where the defendant maintained his office. Miss Evans returned to the office, and gave the $20,000 cashier's check to the defendant. The defendant knew that this $20,000 was the same money that he had loaned to the plaintiff on June 9, 1961.

The defendant took the cashier's check to the Studio City branch of the Bank of America, some three miles from his office. The defendant usually banked by mail, but testified that he went to the bank personally once or twice a week. At the Studio City branch, the defendant deposited the $20,000 cashier's check in his account and purchased a foreign draft, payable to Gonzalo Jiminez, in the amount of $24,000 and paid $6.25 in charges. The ledger sheet at the Studio City branch shows that no other business was transacted at that branch by the defendant on June 21, 1961.

On June 21, 1961, prior to his going to the bank, the defendant had met with Mr. de Escamilla to work out the financial settlement of their partnership in the Hamlin Street office building. Linnette Evans, the defendant's secretary, typed two deeds covering the property upon which the office building was situated to be signed by Mr. and Mrs. de Escamilla in favor of the defendant and his wife. Mr. de Escamilla was to receive $4,000 upon the execution of these deeds. The draft in favor of Gonzalo Jiminez for $24,000 was the total of the $20,000 received back from Mr. de Esca-

milla and the $4,000 purportedly paid for the settlement of the Hamlin Street partnership, out of partnership funds.

Mr. de Escamilla had become obligated to pay his share of the cost of the Hamlin Street building in excess of construction loans, but had been unable to do so. The defendant was aware of that on June 21, 1961. Mr. de Escamilla's position and Cal World's position on June 21, 1961, were extremely tenuous. Cal World had been forced to repay various sums paid in by franchise holders. Mr. de Escamilla had had to pay a substantial amount of attorney's fees. The Labor Commissioner was threatening action, and it did not appear that the employment agency's license could be retained. Mr. de Escamilla was sick and tired of it and was determined to get away from it all. The defendant was aware of the troubles with the Labor Commissioner. After June 21, 1961, Mr. de Escamilla cut back on the Beverly Hills office of Cal World. He laid off the office girls and the switchboard operator. On July 6, 1961, an accusation was filed against Cal World, de Escamilla and others by the Labor Commissioner charging numerous violations of the Labor Code and seeking suspension or revocation of the license of one George R. Novotny to operate an employment agency under the name of Cal World.

Mr. de Escamilla and the defendant had known each other for several years when in 1960, Mr. de Escamilla approached the defendant about constructing an office building on Hamlin Street. Mr. and Mrs. de Escamilla owned the lots on Hamlin Street, and Mr. de Escamilla proposed to the defendant that a two-story office building be constructed on the lots and that they share in the ownership. The building was completed at the end of 1960. Defendant's duties in the Hamlin Street venture included the arranging of construction financing and supervising the construction. Title to the property was held in the names of Mr. and Mrs. de Escamilla and the defendant and his wife. Partnership returns were filed for 1960 and 1961, in which the two partners listed were the defendant and Mr. de Escamilla. A bank account was maintained in the name of "Temple-Escamilla," in which the rents related to the building were deposited.

Under their agreement, the defendant and Mr. de Escamilla were each to contribute the funds necessary to complete the construction in excess of the construction loan. Although the defendant had requested Mr. de Escamilla to pay in additional sums to the Hamlin Street project during the end of 1960 and early 1961, Mr. de Escamilla was unable to do so. The latter owed defendant between $25,000 and $35,000 for his share. Finally, the defendant acquired Mr. de Escamilla's interest, paying a total of $8,299.31: $4,000 on June 21, 1961; $2,000 on August 30, 1961, and $2,229.31 on October 4, 1961. The two latter payments above were subsequent to the

commencement of litigation against Cal World, de Escamilla and others by the plaintiff. It was the $4,000 paid on June 21, 1961, from partnership funds combined with the $20,000 provided by the defendant on June 9, 1961, that went to Senor Jiminez in Mexico.

There were other transactions which involved Mr. de Escamilla and the defendant. On February 21, 1961, de Escamilla gave the defendant his check for $6,000 drawn against funds obtained for Cal World. On the same day the defendant sent $5,000 of the $6,000 to Florida in connection with a transaction known as International Boating Association or IBA, in which both defendant and de Escamilla were to participate.

Another transaction between defendant and de Escamilla occurred on April 28, 1961. On that date the defendant borrowed $10,000 of the funds paid in by the plaintiff for the business of Cal World of Beverly Hills, Inc. This corporation was formed on or about March 31, 1961, and plaintiff had paid in a little over $50,000 in cash for a one-half interest therein prior to any permit having been issued by the Commissioner of Corporations. A check was issued to the defendant for $10,000 drawn on the account of Cal World of Beverly Hills, signed by de Escamilla. The defendant paid back the loan one and one-half weeks later. He paid no interest on the loan and considered it to be a personal loan from Mr. de Escamilla. Plaintiff knew nothing of this transaction and had not authorized any of her funds to be used for purposes other than the Beverly Hills office. The defendant knew that the money came from the Beverly Hills corporation.

Although the defendant and Mr. de Escamilla had talked about a Mexican resort hotel venture prior to 1961, it was in February, 1961, after the plaintiff had paid funds into Cal World, that direct efforts were made to acquire land for the venture.

The defendant was aware of the fact that American citizens could not own land in Mexico within a certain proximity to the ocean. Together with his and Mr. de Escamilla's attorney, Mr. Ball, he consulted with the law firm of Newman and Newman, specialists in Mexican law, to determine the method by which land might be acquired for a hotel notwithstanding such prohibition. As a result of conversations with Mr. Newman and among themselves, it was determined that the transaction would be one in which title to the property would be taken in the name of either Mr. de Escamilla's wife, a citizen of Mexico, or Mr. de Escamilla's brother-in-law, Gonzalo Jiminez, a Mexican citizen who lived in Mexico. It was understood that such person acquiring title to the land would be holding it not alone for Mr. de Escamilla, but for all parties who would have an interest in the hotel project.

Without regard to the precise form of the transaction, the defendant made it clear that he would have to be in complete control of the situation. He proposed that he build the hotel and supervise its construction. The defendant had insisted that he have control of any transaction in which he invested his funds. Consistent with this policy, the funds for the International Boating Association transaction went through the defendant's account. Similarly, the funds in the Hamlin Street partnership were controlled by the defendant, and lastly, when the $24,000 was sent to Senor Jiminez in Mexico for the purchase of the Mexican land, it was disbursed by the defendant.

Prior to February 1961, Mr. Ball, de Escamilla and the defendant flew to Mexico and visited La Paz as a possible site for a resort hotel. As a result of this trip, La Paz was eliminated as a proposed site. In February 1961, the defendant and Mr. de Escamilla flew to Puerto Vallarta, and it was determined by the defendant, concurred in by Mr. de Escamilla, that this would be the place to build a hotel. They agreed that de Escamilla should arrange to acquire land in Puerto Vallarta on which to build a hotel.

As heretofore related, on the weekend of Father's Day, June 18, 1961, the defendant and Mr. de Escamilla were to fly to Puerto Vallarta together, but the defendant cancelled the trip because he wanted to be with his children. This was the weekend following the recording of the deed for the Santa Monica lot from the plaintiff to the defendant and the weekend before the Monday that the defendant deposited the loan funds from Mutual.

On Wednesday, June 21, 1961, after de Escamilla returned from Mexico, the defendant went to the Bank of America in Studio City and purchased the foreign draft for $24,000, payable to Gonzalo Jiminez. He obtained this draft by depositing $24,000 to his account, $20,000 of which was the money that had passed through the plaintiff's hands to Mr. de Escamilla, and which had come back to the defendant in the form of a cashier's check, purchased by de Escamilla against the deposit in de Escamilla's account of the check for $20,000 given by defendant to plaintiff as the loan money on the Santa Monica lot and which the latter had endorsed and delivered to de Escamilla to be used in the business of Cal World. The $4,000 additional to purchase the foreign draft came from the partnership funds in the Temple-de Escamilla-Hamlin Street account. As heretofore pointed out, the defendant paid the cost of the foreign draft.

After June 21, 1961, the defendant went to Puerto Vallarta with Mr. de Escamilla in connection with the hotel venture, where he met with Mr. Jiminez and Marcelo Montecón Montes, who was either the owner or the son of the owner of the proposed hotel site in Puerto Vallarta. On July 6,

1961, a contract was entered into between Senor Jiminez and Senor Montes for the purchase of approximately 10 acres of land in Puerto Vallarta.

Although the foreign draft in favor of Senor Jiminez had been delivered by defendant to Mr. de Escamilla, the defendant knew that the money was to be sent to Senor Jiminez for the purchase of the land in Puerto Vallarta, that it had been received in Mexico, and had been used for the acquisition of the hotel site.

In November 1961, after Mr. de Escamilla had given up his residence in the United States, he wrote to the defendant in part "I will phone you from Guadalajara, or will wire you from Ballarta, what ever I have to report."

In December 1961, Mr. and Mrs. de Escamilla returned to the United States. The defendant flew back to Puerto Vallarta with them. While in Puerto Vallarta, the defendant and Mr. de Escamilla continued to work on the hotel venture. The defendant returned again to Puerto Vallarta in February 1962.

The Labor Commissioner's accusation was filed July 6, 1961, and immediately thereafter Mr. de Escamilla, Mr. Peters, and Mr. Novotny, all connected with the operation of the business of Cal World, were arrested. Thereafter, a receiver was appointed to operate the business of Cal World, and soon thereafter the employment agency license was surrendered. Plaintiff had retained counsel at the end of July 1961, and immediately commenced efforts to recover her funds, including the funds which had been sent to Mexico. The defendant was aware of the fact that plaintiff was attempting to recover her funds. She was unsuccessful in her attempt to recover any funds in Mexico. On August 1, 1961, Mr. Dreyfuss, one of plaintiff's counsel, met with the defendant and asked him if he owed any money to Mr. de Escamilla. The defendant said he did not and that the $4,000 paid on June 21, 1961, was the full settlement. Two thousand dollars and $2,229.31 were sent to Mr. de Escamilla on August 30, 1961, and October 4, 1961, respectively by the defendant in settlement of the Hamlin Street building arrangement.

### Contentions on Appeal Relating
### to Claimed Substantive Errors

The defendant urges that (1) the trial court's finding that the deed from plaintiff to defendant was a mortgage is contrary to law and is unsupported by the evidence; (2) plaintiff's Los Angeles Superior Court action number 776047 is res judicata of the issues in the present action; (3) the finding that plaintiff was not indebted to the defendant is not supported by the evidence;

(4) the finding that a joint venture existed between the defendant and de Escamilla in connection with the hotel project in Mexico is contrary to law, and (5) the court erred in its findings and conclusions concerning usury in connection with the loan from defendant to the plaintiff.

### The Deed as a Mortgage

■ It is held in all the jurisdictions in the United States but one (Pennsylvania) that whether a deed absolute and agreement of reconveyance together constitute a mortgage or a conditional sale depends on the intention of the parties at the time of the consummation of the contract. And such intention may be gathered from the instruments themselves, and from extrinsic evidence of previous and subsequent acts or declarations of the parties insofar as they are relevant on the inquiry of the intention at the time of the execution of the contract. ■ The agreement of reconveyance of itself is not a conclusive indication, but is merely some evidence which, when considered with all other attendant circumstances, may show the transaction to be a mortgage. (79 A.L.R. 938.)

■ In determining the intention of the parties, various factors may be considered, some of which are (1) the continued existence of a debt or a promise to pay, (2) the fact that the amount to be paid for reconveyance is to be the same as the amount paid for the original deed, (3) a great inequality between the value of the property conveyed and the price alleged to have been paid for it, (4) the grantor remaining in possession with the right to reconveyance on payment of the debt, and (5) a declaration of the grantee that he would not take a mortgage, but must have a sale of the property. (See 33 Cal.Jur.2d, Mortgages, § 44 et seq., p. 457.)

■ Without belaboring the evidence, the record shows that plaintiff promised to repay to the defendant the sum of $23,000; the amount to be paid for reconveyance exceeds by $3,000 the amount paid for the original deed; the deed and the agreement to reconvey were executed and exchanged simultaneously; there was great inequality between the value of the property conveyed ($35,000) and the price claimed to have been paid ($20,000); the plaintiff (grantor) paid taxes on the property conveyed and had her gardener do work on the premises after the conveyance, and the defendant (grantee) told the plaintiff, when asked by her why it was necessary to execute a deed to her property to him, that it was a quick way to get the money and for her not to worry, the property was not his. Viewing the record in the light most favorable in support of the judgment, we are of the opinion that the finding that the deed from the plaintiff to the defendant conveying title to the Santa Monica property was, in fact, a mortgage is not contrary to law, and is supported by substantial evidence warranting a clear and

satisfactory conviction to that effect. (See *Beeler* v. *American Trust Co.,* 24 Cal.2d 1, 7 [147 P.2d 583].)

## Res Judicata

On July 26, 1961, the plaintiff and her son, Bruce Sperling, filed an action in the Superior Court of Los Angeles County, number 776047, against Ricardo de Escamilla, Lilia de Escamilla, George R. Novotny, Harley Peters, Cal World Agency, Inc., a California corporation, Cal World Agency of Beverly Hills, Inc., a California corporation, and several Does. The original complaint was amended on August 31, 1961. In this action the plaintiffs sought recovery of $115,500. This amount was made up from various sums of money delivered to de Escamilla over the period from the first part of February through June 1961, and included the sum of $20,000 received as a loan on the Santa Monica property. The main thrust of the action was that the officers and directors of the corporate entities had conspired to and did obtain the monies from the plaintiffs by means of false and fraudulent representations and pretenses in that the monies would be used in the business of the corporate entities whereas it was wrongfully diverted to the personal use of the individual defendants.

On September 11, 1961, a stipulation for judgment in the sum of $115,000 in favor of the plaintiffs and against the defendants Ricardo de Escamilla, Lilia de Escamilla, George R. Novotny, Harley Peters, and Cal World Agency, Inc. was entered into. The stipulation provided, among other things, "that entry of such judgment shall not be deemed an admission of any party of any allegations in the pleadings filed herein with respect to conspiracy, fraud, deceit, conversion or any other act or omission involving allegations or inferences of bad faith or moral turpitude, except that nothing herein or in such judgment contained shall preclude presentation of evidence thereon by either party in any bankruptcy or supplementary proceedings."

On December 7, 1961, plaintiffs amended their complaint by substituting the name of Hubert A. Temple (defendant here) in place of Doe 1.

On December 19, 1961, judgment by consent, pursuant to the foregoing stipulation for judgment, was entered. On the same date service of the summons on the amended complaint was made on the defendant Temple. On August 3, 1966, the action was dismissed as to the defendant Temple under the provisions of section 583 of the Code of Civil Procedure pursuant to stipulation of the parties. The judgment in this action remains unsatisfied.

In determining the plea of res judicata three questions are pertinent: Was the issue decided in the prior adjudication identical with the one

presented in the action in question? Was there a final judgment on the merits? Was the party against whom the plea is asserted a party or in privity with a party to the prior adjudication? (Cf. *Bernhard* v. *Bank of America,* 19 Cal.2d 807, 813 [122 P.2d 892].)

The identical issue as to whether the plaintiff here retained title to the Santa Monica Property under the loan transaction of June 9, 1961, and whether the title was vested in her because the loan had been repaid was not before the court in action number 776047. There was no final judgment on the merits in the former action relating to these issues as such action was voluntarily dismissed by consent of the parties. (*Goddard* v. *Security Title Ins. & Guar. Co.,* 14 Cal.2d 47, 52 [92 P.2d 804].) In these circumstances the voluntary dismissal of the former action was not res judicata of the issues raised and determined in the present action.

### Indebtedness of Plaintiff to Defendant

The finding of the trial court that plaintiff was not indebted to the defendant at the time of the filing of her action here is based upon the facts surrounding the loan, the return of the identical loan money to the defendant through Mr. de Escamilla, with knowledge on the defendant's part that it was the same money he had loaned to the plaintiff, and its subsequent diversion to a joint venture in Mexico between the defendant and Mr. de Escamilla. The evidence disclosed that the defendant knew that Mr. de Escamilla was obtaining the loan on behalf of the plaintiff to raise funds to be invested in her behalf in Cal World. Defendant was aware that Mr. de Escamilla in negotiating for the loan was acting as the plaintiffs' agent. When the identical funds which he had loaned to plaintiff came right back into his hands through Mr. de Escamilla, marked for an investment in a joint venture between the defendant and Mr. de Escamilla, the defendant was found to use reasonable diligence and prudence to ascertain whether Mr. de Escamilla was acting and dealing with him within the scope of his powers bearing upon the disposition of plaintiff's money. Where, in violation of his duty, an agent makes a payment or appropriation of his principal's money to a third person, the principal may recover of the third person the money so misapplied, unless the third person is a bona fide holder for value and without notice. (*Friend & Terry Lbr. Co.* v. *Devine,* 50 Cal.App. 102, 107 [194 P. 754]; 3 C.J.S., Agency, § 277c(1), p. 215.) Here, the defendant was not a bona fide holder for value of the plaintiff's money. Upon receipt of the money, he collaborated with de Escamilla in knowingly converting her funds to a use and purpose for the joint benefit of himself and de Escamilla, contrary to the plaintiff's instructions to her agent. In the circumstances here shown, absent the consent of the plaintiff for the diversion of her funds to the joint venture between the defendant and Mr. de Escamilla, upon such diversion the

defendant became indebted to the plaintiff in the sum of $20,000, and the trial court properly treated this as an offset against the loan and tantamount to payment of the loan.

### The Joint Venture

The trial court found that "Prior to and after June 9, 1961, Ricardo de Escamilla and defendant Temple were engaged in a joint venture which planned to build a hotel in Mexico."

The defendant attacks this finding and its imposition of vicarious liability on him for the use of the $20,000 to purchase the land for the hotel site.

■ A joint venture resembles a partnership in that its members associate together as co-owners of a business enterprise, agreeing to share profits and losses. However, a partnership ordinarily engages in a continuing business for an indefinite or fixed period of time, while a joint venture is formed for a single transaction or single series of transactions, thus being more limited in both scope and duration. (3 Witkin, Summary of Cal. Law (1960), Partnership, § 9, p. 2271.) ■ Ordinarily, a joint venture is created by contract or agreement between the parties, but there need not be any formal written agreement between the parties defining their respective rights and duties. (*Replogle* v. *Ray,* 48 Cal.App.2d 291, 295 [119 P.2d 980].) Such a venture may be formed by parol agreement. (*Nelson* v. *Abraham,* 29 Cal.2d 745, 749 [177 P.2d 931].) ■ Such a joint venture may be assumed as a reasonable deduction from the acts and declarations of the parties. (*Nelson* v. *Abraham, supra,* pp. 749-750; *Singleton* v. *Fuller,* 118 Cal.App.2d 733, 740 [259 P.2d 687]; 138 A.L.R. 968-969.) ■ The defendant and Mr. de Escamilla discussed the matter of building a hotel in Mexico. They went together to Mexico and surveyed possible sites for the project. They consulted with a law firm to ascertain the best means of obtaining and holding title to the land which apparently was to be situated near the ocean. They flew together to Puerto Vallarta and determined that this was the city that needed a hotel. The site in Puerto Vallarta was selected prior to June 9, 1961, before the money was borrowed from the plaintiff. The hotel site was purchased with $24,000 sent to Mexico by the defendant, $20,000 of which was money advanced by the plaintiff for investment in Cal World, which was known by the defendant.

There is substantial evidence in the record to support the trial court's finding that the hotel project in Puerto Vallarta between the defendant and Mr. de Escamilla was a joint venture.

■ "Where one joint adventurer, acting within the scope of the joint

venture, and in furtherance of its agreed purpose, is guilty of fraud in procuring benefits which are retained by the joint adventurers, all are liable for the fraud in compensatory damages. [Such] [l]iability is imposed under elementary principles of agency. (Rest., Agency, §§ 160-162, 257, 258.)" (*Grant* v. *Weatherholt,* 123 Cal.App.2d 34, 45-46 [266 P.2d 185].)

Under the facts and the law applicable thereto, the defendant, a member of the joint venture, became liable to the plaintiff when the joint venture accepted and used the plaintiff's money obtained from her by the fraud of de Escamilla, who was also a member of the joint venture acting within the scope and in furtherance of its agreed purpose. (Cf. *Deicher* v. *Corkery,* 205 Cal.App.2d 654, 662-663 [23 Cal.Rptr. 270].)

### *Usury*

Defendant urges that the trial court erroneously found that the loan from defendant to plaintiff whereby the plaintiff became obligated to pay the defendant $3,000 for the use of $20,000 for the period of six months was tainted with usury and that, therefore, the defendant was not entitled to interest on the loan.

Interest of $3,000 on a loan of $20,000 for the period of six months is equivalent to interest at the rate of 30 percent per annum. The lawful rate of interest allowed on such a transaction is 10 percent per annum. (Cal. Const., art. XX, § 22; *Shirley* v. *Britt,* 152 Cal.App.2d 666, 669 [313 P.2d 875].) It is to be noted that the plaintiff did not deal with Mutual in the loan transaction, but dealt directly with the defendant through de Escamilla. She was not aware that the defendant was borrowing money from Mutual on her Santa Monica property. Assuming, however, that the defendant would be entitled to deduct the amount of his costs in obtaining his loan from Mutual from the interest charged to plaintiff on his loan to her (cf. *Haines* v. *Commercial Mortg. Co.,* 200 Cal. 609, 616 [254 P. 956, 255 P. 805, 53 A.L.R. 725]; *Orlando* v. *Berns,* 154 Cal.App.2d 753 [316 P.2d 705]) in determining whether the transaction is usurious, this will not relieve the transaction from the taint of usury. The cost to the defendant in making his loan with Mutual was $741.20. The rate of interest on this loan is 6.6 percent per annum. The note evidencing this loan was dated June 12, 1961 and became due on June 15, 1962. The loan between the plaintiff and defendant was for the period of six months from June 9, 1961. On June 21, 1961, defendant became indebted to plaintiff in the sum of $20,000 by reason of the diversion of her funds to the joint venture. This, in effect, was tantamount to the payment of the principal sum of her promissory note to the defendant. If it is claimed that the loan from Mutual to the defendant was obtained for the benefit of the plaintiff, in order to justify the deduction by the defendant of the cost of such loan from the

interest charged on the June 9 loan from defendant to plaintiff, then the $20,000 of plaintiff's funds diverted to the joint venture should be applied to the Mutual loan to reduce the cost of such loan to the defendant. The cost to the defendant of interest on the Mutual loan would be 6.6 percent on $20,000 from June 12, 1961 to June 21, 1961, or for the period of 9 days, which would amount to approximately $32.58, making a total cost to the defendant of the Mutual loan of $773.78. This sum deducted from the $3,000 would leave a net sum of interest which the defendant was entitled to receive, in accordance with the terms of the loan, in the amount of $2,226.22 on a loan of $20,000 for the period of six months. This would equal about 22 percent interest per annum which clearly would leave the transaction tainted with usury.

The defendant urges that plaintiff is estopped from asserting the taint of usury in the loan made by defendant to her because she exacted an identical usurious guarantee and assumption of the indebtedness from de Escamilla. The record does not sustain this claim. The record discloses that the plaintiff did not exact from de Escamilla the promissory note executed by him to the plaintiff on June 9, 1961, in the amount of $23,000 and his guarantee to return her money. This note was handed to the plaintiff by de Escamilla, without her asking for it, at the time she executed the grant deed to her property, and appears to have been given to her to embellish de Escamilla's chances of fraudulently obtaining possession of plaintiff's money. The plaintiff has asserted no claim here based upon this note, nor does it appear that she pursued a usurious claim based upon the note in action 776047. Furthermore, the defendant has cited no authority, and we are aware of none, which gives him status to raise the claim in this action of a usurious transaction between plaintiff and a stranger to the action, as a defense in his dealing with the plaintiff.

On September 11, 1962, a stipulation was entered into between the parties that it was in their best interest that the Santa Monica property be sold and that the net proceeds from the sale, after payment of the existing indebtedness to Mutual, taxes and expenses of the sale, be held for the benefit of the parties subject to their joint written order or subject to a final judgment in this action.

Pursuant to this stipulation the property was sold on November 2, 1962, for a total sales price of $37,000. Of this sum $20,539.81 was paid to Mutual to repay the money advanced to the defendant including interest and service charges. The sum of $288.21 was deducted for taxes and $2,142.70 was deducted for expenses of the sale, leaving a net of $14,029.28 which was held by Mutual pursuant to the stipulation.

Based upon the foregoing, the trial court rendered judgment for the

plaintiff and against the defendant in the sum of $20,539.81, plus interest, based upon his receipt of the loan funds, and awarded the plaintiff the balance held by Mutual pursuant to the stipulation after deducting taxes and expenses of sale.

The judgment is affirmed.

Kaus, P. J., and Reppy, J., concurred.

A petition for a rehearing was denied March 26, 1970, and appellant's petition for a hearing by the Supreme Court was denied April 22, 1970.