61 Cal.Rptr.3d 789 (2007)
152 Cal.App.4th 620
ALLIANCE PAYMENT SYSTEMS, INC., Plaintiff and Appellant,
v.
Lisbeth WALCZER et al., Defendants and Appellants.
No. A111425.
Court of Appeal of California, First District, Division One.
June 25, 2007.
*792 Morgan, Franich, Fredkin & Marsh, Mark B. Fredkin, San Jose, Donn Waslif, Attorneys for Appellant/Plaintiff  Alliance Payment Systems, Inc.
Carr, McClellan, Ingersoll, Thompson & Horn, W. George Wailes, Lori A. Lutzker, Burlingame, Attorneys for Appellants/Defendants  Lisbeth Walczer et al.
MARCHIANO, P.J.
Plaintiff Alliance Payment Systems, Inc., a California corporation (APS), appeals from an order granting a new trial in its action against Lisbeth Walczer and Reliable Processing Solutions (RPS; Walczer and RPS are hereafter referred to collectively as defendants) to collect amounts allegedly owed under a settlement agreement that divided a business. Defendants have filed a protective cross-appeal from the judgment after a bifurcated trial.
In the first phase of the trial, a jury awarded APS damages under two provisions of the settlement agreement: one prohibiting the parties from soliciting each other's customers, and another requiring that the parties each forfeit to the other any revenue they received from the other's customers, regardless of solicitation. In the second phase of the trial, the court found that the revenue forfeiture provision was unenforceable as an illegal restraint of trade, and the court subsequently ordered a new trial because the verdict may have erroneously awarded damages under that provision.
The principal issues presented are whether the settlement provisions are restraints of trade prohibited by Business and Professions Code section 16600, and, if so, whether they are excepted from the prohibition under Business and Professions Code sections 16601 or 16602.[1] We conclude that the provisions are restraints of trade, that the forfeiture of residuals for five years after dissolution, as discussed below, is illegal, but that the antisolicitation covenant is enforceable under section 16602 as a restraint imposed in connection with the dissolution of a partnership, or the disassociation of a partner. We agree with the trial court's determinations, and affirm the new trial order.

I. FACTUAL AND PROCEDURAL BACKGROUND
This lawsuit is part of the fallout from the breakup of the professional and personal relationship between Lisbeth Walczer and Robert Joyce, APS's founder and *793 sole shareholder. Mr. Joyce and Ms. Walczer are merchant service providers in the credit card industry. They solicit merchants to sign up with a third party processor of credit card payments, sell hardware and software to the merchants for credit card transactions, and service the merchants by helping them with supplies, equipment, and payments. Service providers receive commissions known as "residuals" from the third party processor on credit card payments to their merchants.
Joyce operated Crown Card Services (Crown) from 1986 to 1994; Walczer worked for Crown from 1991 to 1994. Thereafter, Walczer worked at First Data Merchant Services (First Data), and Joyce started Chestnut Card Services (Chestnut). Walczer and Joyce began living together in 1997. In 1998, Joyce approached Walczer about leaving First Data; at the time, Chestnut was receiving residuals of $15,000 per month through the third party processor American National Bank (ANB). Joyce proposed, in Walczer's words at trial, that "we would join together and form a new company. We would take Chestnut Card Services and rename it and form a joint venture or partnership, and we would work together. He would work on his side and I would start bringing in business from my side."
Joyce and Walczer signed the following agreement on May 23, 1998:
"Outline/Purpose: Robert Joyce (Bob) and Lisbeth Walczer (Lis) desire to enter into a business venture together. This document outlines their understanding, as evidenced by their signatures, of mutual objectives, responsibilities and compensation.
"The name of Chestnut Card Services, a California corporation 100% owned by Bob, shall be changed to Alliance Payment Systems (APS).
"Office space acceptable to both, of approximately 800-1,000 square feet in size, shall be obtained, somewhere between San Carlos and San Bruno.
"Bob will continue to maintain his home office at 816 Lakeshore Drive and will divide his time as needed between both offices. Lis will resign from her position with FDMS and will devote 100% of her business activities to APS effective July 1, 1998.
"This joint venture will initially be 100% funded by existing company funds and those of Bob's. Bob will be responsible for the rent, furniture, utilities and all other expenses, including but not limited to industry assessments and fees, purchase of inventory, forms, advertising, recruiting and shipping expenses.
"The stock of APS will initially be owned 100% by Bob. He will draw no compensation from the joint venture. Lis will draw funds as needed for ordinary living expenses, not to exceed $5,000 per month until such time as the r[es]idual revenue generated by merchant accounts obtained by her and other sales revenue exceeds that amount. It shall be her objective, through her activities, to generate as much new business for the company as possible in order to contribute to corporate profits so that the income does not ever exceed the outgo.
"Bob will continue to operate and attempt to grow his portion of the business submitted to American National Bank for an indefinite period in order to generate sufficient cash flow for the joint venture. Lis will be fully responsible for all sales and service functions. Bob and Lis will consult each other on all business activities and no decisions shall be made without the approval of the other.
"At such time as Lis personally and the efforts [of] sales personnel hired by her and for which she is responsible, begin to contribute to corporate profits, her percentage *794 of ownership shall increase accordingly. At the end of every quarter the residual revenue stream shall be reviewed and a percentage of ownership for Lis will be determined by the percentage of revenue generated by her as a percentage of the total, without regard for expenses, which shall be maintained in an ordinary manner and agreed upon by both Bob and Lis. At such time as the residual revenue generated by Lis reaches the amount of $15,000 per month she shall become a 50% vested shareholder in APS, be assigned the corporate title of Vice President and be entitled to all of the benefits thereof. It is at this point that all company activities and funds shall be combined without regard to personal achievements and responsibilities. Bob's home office will be closed, Lis will [be] authorized to sign on the corporate checking account and ongoing compensation for each shall be determined.
"In the event of non-performance of this joint venture by either Bob or Lis, the damaged party shall be entitled to compensation for all out of pocket expenses accrued. No provision is made for time and labor."
APS contracted with NOVA Information Systems, Inc. (Nova) in June 1998 to process new accounts, and Walczer brought in John Gallups and Charles Malley in 1999 as sales representatives. Malley, who had worked with Walczer at First Data, testified that when Walczer called him about joining APS, she told him that she and Joyce were partners in the business. Joyce testified that he continued to service his ANB accounts, and that the ANB side of the business "remained fairly stagnate" from 1998 to 2000, while the Nova side grew thanks mainly to Walczer's efforts.
Joyce acknowledged that, by October 1999, Walczer was bringing in residuals of more than $15,000 per month, and had thereby satisfied the condition for obtaining 50 percent ownership of APS under their May 1998 agreement. Joyce told Walczer that he considered her a 50 percent owner, and he said at trial that, as far as he was concerned at that point, she "could have taken whatever she wanted" in compensation from the business. However, he did not give her any stock in APS because of tax considerations and concerns relating to his divorce proceeding.
At Walczer's request, Joyce wrote and signed the following letter, dated October 30, 1999:
"To Whom It May Concern:
"I, Robert V. Joyce, being of reasonably sound mind, do hereby state the following information with regard to the proper distribution of the assets and liabilities of Alliance Payment Systems, hereinafter referred to as `APS,' in the event of my death.
"At the present time, I am listed as the only stockholder and corporate officer of APS. In June of 1998, the name of Chestnut Card Services was changed to Alliance Payment Systems and a partnership between Lisbeth Walczer and me was created. In due course, this partnership will become officially sealed with the appropriate redistribution of stock, at which time Lisbeth shall receive 50% of the shares outstanding. This is my intention.
"Lisbeth presently performs her corporate functions with the title of Vice President and as of October 25 was added to the corporate checking account maintained with Washington Mutual Bank. The purpose herein is to advise those who may be concerned about such matters that I hereby bequeath the 50% portion of APS that I will retain once the transfer has been made official, to Lisbeth, thereby giving her full and complete control and administration of the affairs of APS."
*795 Joyce and Walczer's relationship soured in 2000, and they moved into separate residences. Walczer said that, before they separated, he wrote her letters saying that "he would rather be my lover than my business partner," but she "had debated and ... decided that that was not a good way to go." Walczer said that she proposed "that we should separate the business at the end of 2000," and Joyce agreed.
Walczer ran the business on her own in 2001, using a bank account at Morgan Stanley in the name of "APS sole proprietorship"; Joyce authorized Nova in January 2001 to deposit APS's residual payments into that account, and thereafter received his residuals from Walczer. Walczer said that Joyce offered to go to work for her in July 2001 as her office manager. Walczer did not believe that Joyce was qualified for the position, but suggested that he come into the office to see what was involved. He did so, was uncomfortable in the office, and the subject was dropped.
Joyce and Walczer failed to settle their business affairs in 2001, and gave conflicting reasons for that failure. At the end of 2001, Joyce moved to Reno and transferred all of the assets of APS to Alliance Payment Systems, Inc., a Nevada corporation. In January 2002, Joyce instructed Nova to deposit APS's residuals into his Nevada bank account, rather than Walczer's Morgan Stanley account, to gain leverage against her in their dispute.
At the end of 2001 or beginning of 2002, Malley and Gallups decided to keep their accounts with Joyce, rather than Walczer. Walczer, who had been servicing those accounts, testified that Malley sent out a letter on APS letterhead to the merchants telling them that their service was going to be switched to Joyce's 800 number. Joyce wrote Walczer a letter on January 14, 2002, stating in part: "You will be paid in full for ... all of your own accounts in a timely manner and will continue to be paid as such so long as you agree not to attempt to move any accounts written by either John Gallups or Chuck Malley, regardless of the reason. Specific individual accounts of theirs may be negotiated should we ever reach a point whereby our dissolution is on course to be amicably resolved."
Walczer filed a complaint against Joyce on January 22, 2002, for breach of the May 1998 contract, which she called in her verified complaint "a joint venture agreement for the conduct of the business of APS." The suit, which named APS as coplaintiff, alleged that Walczer had performed all of the conditions required to obtain "an equal interest in the business and APS," and sought injunctive and declaratory relief as well as damages. The cause of action for declaratory relief stated: "An actual controversy exists between Walczer and Joyce concerning their rights and duties with respect to the joint venture. [¶] Walczer contends that she is an equal owner of the joint venture in the form of APS; that the assets of the joint venture are in APS and the business conducted by APS, including all business previously conducted by Joyce. [¶] Joyce disputes Walczer's interest in the joint venture or APS, or in the business of APS, or the goodwill to the business, and [contends] that he has the sole and exclusive right of management including the right to direct contracting parties with APS, to make payments to him."
Walczer sent Joyce a letter dated April 19, 2002, requesting funds to reimburse her merchant servicing costs, and remarking, "... I never thought it would go this far or be this difficult to separate our business." Joyce responded in a letter dated April 28, 2002, noting among other things that they had "spent over one year discussing the termination of whatever it was we had together...." Walczer then *796 withdrew $100,000 from APS's Washington Mutual account, because, she said, she needed the money and wanted "[t]o get Mr. Joyce's attention." Joyce responded by threatening to have her criminally prosecuted.
After extensive, mediated negotiations, Joyce and Walczer overcame this impasse and along with APS entered into an agreement effective June 1, 2002, settling the lawsuit, which was described in the agreement as one "in which Walczer seeks an ownership interest in APS and/or in the merchant accounts and other assets ostensibly held in the name of APS and/or seeks to establish that a joint venture was created between her and Joyce and a dissolution of the joint venture." The agreement divided APS's accounts between those transferred to Walczer, which included those procured by Walczer, and those retained by APS, which included those procured by Joyce, Gallups, and Malley.
The agreement contained the following key provisions central to this case (hereafter sections 7(d) and 7(e)):
"7. Transition and Future Solicitation

"[¶] ... [¶]
"(d) No Solicitation

"(1) APS agrees that, for a period of five years after the date of this Agreement, neither APS nor anyone acting for APS or Joyce shall solicit or call upon any merchant whose account is one of the Transferred Accounts for the purpose of suggesting or causing the transfer of any Transferred Accounts away from Walczer or any other business Created by her, including Reliable Processing Solutions.
"(2) Walczer agrees that, for a period of five years after the date of this Agreement, neither she nor anyone acting for her, nor any business with which she is affiliated, shall solicit or call upon any merchant whose account is one of the Reserved Accounts for the purpose of suggesting or causing the transfer of any of the Reserved Accounts away from APS.
"(e) Continuation of Residuals from Transferred and Retained Accounts

"This Agreement is based in substantial part on the parties' mutual assumption that the residual revenue from the merchant accounts will be divided between Walczer and APS such that, in the near future, the residuals from the Transferred Accounts will be received by Walczer, the residuals from the Retained Accounts will continue[ ] to be received by APS, and that neither party will obtain the benefit of any residuals which have been allocated to the other party, even where there has been full compliance with the provisions of sections 7(a) and 7(d). Accordingly, for a period of five (5) years, in the event that an account and/or residual payment which has been allocated to one party under this Agreement is, for any reason whatsoever, hereafter received, directly or indirectly, by the other party, the latter shall be obligated to pay the entire amount of the residual from that account (i.e., the gross amount received for that account from NOVA or another processor) back to the former party. The provisions of this subparagraph apply irrespective of any services rendered or expenses incurred relative to the account by the party receiving the residual from NOVA or other processor."
On September 26, 2002, Joyce wrote Walczer and accused her of breaching section 7(d)'s antisolicitation covenant. On October 1, 2002, Walczer's counsel wrote Joyce's counsel advising that Walczer denied "solicitation of any kind," and charging that section 7(e) was inserted into the agreement without her knowledge. Joyce's counsel replied that section 7(e) had been "specifically negotiated between Bob and Li[s]." Joyce admitted at trial *797 that he had not spoken to Walczer about section 7(e). Walczer said at trial that she would sign the agreement "today" were it not for section 7(e).
APS's complaint in this case, filed in November 2002, asserted causes of action under the settlement agreement for promissory fraud, breach of contract, and interference with economic relations; in the alternative, to the extent that the settlement agreement was invalidated, causes of action were pled for embezzlement/conversion, and breach of fiduciary duty. Defendants filed a cross-complaint against APS and Joyce, seeking reformation of the settlement agreement to delete section 7(e) or a declaration that section 7(e) was unlawful and unenforceable, and damages under several theories including breach of contract. In June 2004, APS moved for summary judgment or adjudication on the cross-complaint. In December 2004, defendants moved for leave to file a first amended cross-complaint asserting causes of action for reformation based on mistake, and for breach of contract. In January 2005, the court granted APS's motion for summary adjudication of the reformation causes of action in the original cross-complaint, and denied the motion as to the cause of action for declaratory relief concerning the enforceability of section 7(e). In February 2005, the court denied the motion to amend the cross-complaint.
Joyce conceded at trial that, when he entered into the settlement agreement, he thought it likely that a number of merchants would want to stay with Walczer when they were told that she would no longer be servicing their accounts, and he admitted that he could not conceive of any of Walczer's merchants wanting to move to APS. The evidence at trial showed that approximately 25 accounts classified as retained accounts under the settlement agreement, operating at 36 or 37 locations, left APS and signed up with RPS, the corporation Walczer formed in 2002 to carry on her business.
Nearly all of the accounts that moved to RPS were originally brought into APS by Malley or Gallups. Malley testified that the six accounts he lost were high volume accounts among his top 10 in profitability. Gallups testified that he called a meeting with Walczer when he discovered that some of his larger volume accounts were migrating to RPS. Gallups asked Walczer why she was "taking these accounts that she knows are mine and my family relies on that income, and she was just standoffish with regards to it." Gallups said that one of his former merchants told him that he had asked Walczer who would be servicing his account after she left APS, and she replied that she was "not really sure." Gallups said that he asked Walczer why she did not tell the merchant "that I'm going to be managing when you know I told you that I'm going to be taking over your role as service[r]," and she said, "It's not my job to sell you."
APS introduced documentation from eight merchants who moved their retained accounts to RPS, consisting of a cover letter and a form to be executed by the merchant and Nova. The cover letters, four of which were dated in May 2002, three of which were dated in June 2002, and one of which was missing, stated: "We are currently a merchant of Nova Information Systems. Due to the unacceptable level of service we now receive, we are requesting a change in service providers to Reliable Processing Solutions."[2] Walczer admitted that she wrote the letters for these merchants and that the statement about unacceptable service was false. She said that she had serviced these merchants and they had no complaints, but Nova requested the statement in the letter "to facilitate the move" to RPS. Seven of the *798 eight forms were signed and dated on behalf of Nova; three in May 2002, four in June 2002.
Walczer was asked, "And, in fact, as early as May, you had gone to accounts to transfer those accounts; had you not?" She answered, "I did. We had no agreement at that time." Walczer was asked, "In June ... you were signing up customers that were supposed to be retained customers under the settlement agreement ... to move as well; weren't you?" She answered, "[U]ntil this document was signed, there was no firm list." The settlement agreement stated that it was executed by the parties "effective as of June 1, 2002, but Walczer testified that she did not sign it until July 28 or 29, 2002. She was asked, "And you knew when you signed the settlement agreement that these accounts in light of the signatures that you already retained were not going to stay with Mr. Joyce?" She answered, "Correct."
Walczer denied soliciting any of the accounts covered by the transfer documents she obtained before signing the settlement agreement; in each case she simply told the merchant that she would no longer be servicing its account. She told people at Montclair Wines, one of Gallup's accounts and one of the accounts she signed up in May 2002, that there was a "tug of war" going on over the account, but she testified that it had not yet been decided at that point whether Gallup's accounts would remain with Joyce. David Belrose, another of the merchants Walczer signed up before executing the settlement agreement, testified that he initiated the transfer after Walczer informed him that she would be leaving APS. It was stipulated that Lee Jester, another such merchant, would testify that he was not solicited by Walczer, but refused to go with APS and insisted that Walczer continue to service his account.[3]
Walczer said that, before the settlement agreement was signed, she communicated that there were retained merchants who intended to move to her company. Joyce said that he was "[m]ost definitely not" apprised before executing the settlement agreement that Walczer had already signed up retained accounts, and that he was relying on keeping those accounts. Joyce said that he did not learn of the retained accounts Walczer had lined up before signing the settlement agreement until he met with her in November 2002, and she told him that she had been "holding some applications as far back as May." He interpreted this statement to mean that she had solicited those accounts to move to her business, but he acknowledged that he "didn't know whether she went to them or they came to her."
In her trial testimony, Walczer conceded initiating a call to one of the retained merchants, Best Western. In her deposition testimony introduced at trial, she said that "they called in for support or supplies, and I initiated a phone call to the owner stating, `This is the situation, you're going to have to make a decision [whether to stay with APS].'" She said at her deposition that, other than Best Western, she "notified all of the [retained] accounts that they were going to be having to deal  I referred them to our APS without exception." At her deposition she acknowledged telling a woman at Dave's Ski Shop, "I suppose I could rewrite the account," but it is unclear from the transcript whether that statement was made before or after a transfer was requested.
Walczer testified that she did not solicit any of the retained accounts after she *799 signed the settlement agreement. She said that she delayed processing some of the transfers so that if "they [APS] wanted to get the business back, they would have had an opportunity to get the business back." Joyce said that APS made no attempt to recover any of the accounts that moved to RPS because he did not think it would have been a good business decision to put merchants in the middle of his dispute with Walczer.
An accountant testified for APS that APS suffered $395,215 in damages under section 7(e) of the settlement agreement for lost profits on the moved accounts during the five-year period specified in the agreement. In its verdict, the jury found that APS sustained losses of $334,716 by virtue of defendants' breach of the settlement agreement, but that APS failed to mitigate damages of $64,400, and thus awarded APS $270,316.
After the jury trial, defendants' defense of illegality was tried to the court. In a May 2005 decision, the court determined that section 7(e) of the settlement agreement was an illegal restraint of trade under section 16600,[4] but that section 7(d) was enforceable under section 16602.[5] Judgment was entered for APS for $270,316, plus costs and reasonable attorney's fees to be determined.[6]
Defendants moved for a new trial, to vacate the May 2005 decision, or for judgment notwithstanding the verdict. The court granted the motion for new trial, denied the motion to vacate, and denied the motion for judgment notwithstanding the verdict. The court "ruefully" ordered a new trial on the ground that it could not be determined from "recourse to the pleadings, the trial evidence, the arguments of counsel to the jury, the jury instructions or the verdict form" whether the jury found that defendants had violated section 7(d), the enforceable provision, or section 7(e), the unenforceable one. The court found it "impossible to construe the verdict as based upon a paragraph 7(d) breach only; even under [APS's] view of the evidence, there is testimony of `solicitation' of but three of the [transferred accounts]. Neither does there exist any indication in the special verdict form that the amount of damages awarded [APS] was derived solely from those three accounts. To interpret the verdict amount as based upon money derived from just those three accounts would mandate a finding by this court that the damage award is not supported by the evidence."[7] The court *800 found no legal authority for the proposition that "evidence of solicitation of one account may support a finding that another and separate account was also solicited," and rejected defendants' argument that judgment notwithstanding the verdict was warranted because there was no evidence that any solicitation occurred.

II. DISCUSSION

A. Summary of Issues

The new trial order rests on four contested conclusions: (1) sections 7(d) and 7(e) are restraints of trade proscribed by section 16600 (fn. 4, ante); (2) section 7(e) is unenforceable under the business sale (§ 16601)[8] or partnership (§ 16602, fn. 5, ante) exceptions to the section 16600 prohibition; (3) section 7(d) is enforceable under the section 16602 partnership exception; and (4) there was evidence of some solicitation of the retained accounts on the part of Walczer, but the evidence was insufficient to compel a finding that Walczer had solicited all of the retained accounts that moved to RPS.

B. Application of Section 16600

Section 16600's prohibition of contracts in restraint of trade codifies California's deeply rooted public policy favoring open competition. (Howard v. Babcock (1993) 6 Cal.4th 409, 416, 25 Cal. Rptr.2d 80, 863 P.2d 150; Hill Medical Corp. v. Wycoff (2001) 86 Cal.App.4th 895, 900-901, 903, 103 Cal.Rptr.2d 779.) Non-competition agreements are void under this statute unless they are specifically authorized by sections 16601 or 16602 (Bosley Medical Group v. Abramson (1984) 161 Cal.App.3d 284, 288, 207 Cal. Rptr. 477), or they are necessary to protect *801 trade secrets, or confidential or proprietary information (Thompson v. Impaxx, Inc. (2003) 113 Cal.App.4th 1425, 1429-1430, 7 Cal.Rptr.3d 427).
Antisolicitation covenants such as section 7(d), which prohibits the parties from soliciting each other's merchants for five years, are routinely viewed as, and voided as, illegal restraints of trade under section 16600. (E.g., Thompson v. Impaxx, Inc., supra, 113 Cal.App.4th at pp. 1427-1429, 7 Cal.Rptr.3d 427; Kolani v. Gluska (1998) 64 Cal.App.4th 402, 405-406, 75 Cal.Rptr.2d 257; Latona v. Aetna U.S. Healthcare Inc. (C.D.Cal.1999) 82 F.Supp.2d 1089, 1091, 1095-1096.)
Section 7(e) also falls squarely within the statutory prohibition. Under 7(e), a party forfeits whatever residuals it receives for five years for servicing the other's merchants. Provisions like this that impose a cost for competition, no less than those that prohibit competition outright, are considered restraints of trade. (E.g., Muggill v. Reuben H. Donnelley Corp. (1965) 62 Cal.2d 239, 240, 242-243, 42 Cal.Rptr. 107, 398 P.2d 147 [plaintiff forfeited pension by going to work for a competitor]; Chamberlain v. Augustine (1916) 172 Cal. 285, 286-288, 156 P. 479 [employee who went to work for former employer's competitor was required to pay employer $5,000]; Gordon Termite Control v. Terrones (1978) 84 Cal.App.3d 176, 178-179, 148 Cal.Rptr. 310 [employee who solicited former employer's clients was required to pay employer $50 per solicited account]; see also Howard v. Babcock, supra, 6 Cal.4th at p. 416, 25 Cal.Rptr.2d 80, 863 P.2d 150 [noting that, in certain contexts, covenants not to compete "typically do not actually prohibit competition, but rather place a price on competition"].) Section 7(e) is an even greater restraint of trade than section 7(d) because it discouraged the parties from servicing the other's merchants even if they did nothing to obtain those accounts, and thus affected the merchants' ability to retain the service provider of their choice as well as the parties' ability to compete.
These conclusions are straightforward, and APS's arguments against them are unavailing.
APS submits that the settlement agreement promotes, rather than restrains, competition, because "the overall intent behind, and a substantial component of, the Settlement Agreement was to facilitate Walczer's new business and arm her with the ability to compete with APS and others in the market." However, while it is true that the settlement agreement facilitated Walczer's business as to the accounts she received, the provisions at issue restricted her ability to compete as to the accounts APS retained.
APS argues that section 7(e) does not qualify as a restraint of trade because it does not prohibit competition, it merely restricts the manner in which competition is carried on. APS reasons: "the only restriction in Paragraph 7(e) is that if an account assigned to one party is taken, that party must pay for the account. Thus, Paragraph 7(e) does not prohibit competition, but only delimits how it can be conducted." This argument is untenable under the authorities cited above establishing that restraints of trade include costs imposed on competition. (Muggill v. Reuben H. Donnelley Corp., supra, 62 Cal.2d at pp. 242-243, 42 Cal.Rptr. 107, 398 P.2d 147; Chamberlain v. Augustine, supra, 172 Cal. at pp. 286-288, 156 P. 479; Gordon Termite Control v. Terrones, supra, 84 Cal.App.3d at pp. 178-179, 148 Cal.Rptr. 310.)
APS contends that section 7(d) and 7(e) are outside of section 16600 because they are restricted to a limited segment of the market. This argument rests on federal court opinions that have carved out a *802 "[n]arrow [restraint [exception" to section 16600 that validates restraints of trade so long as they do not "`... plac[e] a substantial segment of the market off limits.'" (Latona v. Aetna U.S. Healthcare Inc., supra, 82 F.Supp.2d at p. 1094.) No reported California state court decision has endorsed this narrow restraint exception, and review has been granted in a case that has rejected it. (Edwards v. Arthur Andersen LLP (2006) 142 Cal.App.4th 603, 47 Cal. Rptr. 3d 788, review granted Nov. 29, 2006, S147190.)
We will assume for the sake of argument that the APS retained accounts do not represent a substantial segment of the merchant service provider market. However, we are not persuaded that the Ninth Circuit's de minimis exception to section 16600 is consistent with the language or the purpose of the statute. The statute voids every contract restraining trade "to th[e] extent" of the restraint, leaving no room to deem restraints too minor to be unlawful. The statute was originally enacted to abrogate the common law rule allowing "reasonable" restraints of trade (Hill Medical Corp. v. Wycoff, supra, 86 Cal.App.4th at pp. 900-901, 103 Cal.Rptr.2d 779; Bosley Medical Group v. Abramson, supra, 161 Cal.App.3d at p. 288, 207 Cal.Rptr. 477), under which "`an agreement in partial restraint of trade, restricting it within certain reasonable limits or times, or confining it to particular persons, would, if founded upon a good and valuable consideration, be valid '" (Wright v. Ryder (1868) 36 Cal. 342, 358, italics in original.) "The statute makes no exception in favor of contracts only in partial restraint of trade." (Chamberlain v. Augustine, supra, 172 Cal. at p. 289, 156 P. 479.)
"California courts have consistently declared this provision an expression of public policy to ensure that every citizen shall retain the right to pursue any lawful employment and enterprise of their choice." (Metro Traffic Control, Inc. v. Shadow Traffic Network (1994) 22 Cal.App.4th 853, 859, 27 Cal.Rptr.2d 573, italics added.) In rejecting the narrow restraint exception, we follow in the footsteps of "the California courts [who] have been clear in their expression that section 16600 represents a strong public policy of the state which should not be diluted by judicial fiat." (Scott v. Snelling and Snelling, Inc. (N.D.Cal.1990) 732 F.Supp. 1034,1042.)
APS maintains that section 7(e) is outside section 16600 because it is "explicitly directed at protecting APS' valuable property rights purchased from Walczer." However, the only "valuable property rights" that may justify restraints of trade involve trade secrets, or proprietary or confidential information, which are not claimed here  a rule that distinguishes virtually all of the cases on which APS attempts to rely. (See Thompson v. Impaxx, Inc., supra, 113 Cal.App.4th at pp. 1429-1430, 7 Cal.Rptr.3d 427 [distinguishing Gordon v. Landau (1958) 49 Cal.2d 690, 321 P.2d 456; Fowler v. Varian Associates, Inc. (1987) 196 Cal.App.3d 34, 241 Cal.Rptr. 539; John F. Matull & Associates, Inc. v. Cloutier (1987) 194 Cal.App.3d 1049, 240 Cal.Rptr. 211; Loral Corp. v. Moyes (1985) 174 Cal.App.3d 268, 219 Cal. Rptr. 836; and Gordon v. Wasserman (1957) 153 Cal.App.2d 328, 314 P.2d 759]; compare also King v. Gerold (1952) 109 Cal.App.2d 316, 318, 240 P.2d 710 [upholding prohibition against use of proprietary design].)
APS argues that section 7(e) should be excepted from section 16600 because of the "mutuality of the provision," but whether a covenant not to compete is mutual has no bearing on its enforceability. (See Kelton v. Stravinski (2006) 138 Cal. App.4th 941, 943, 946-947, 41 Cal.Rptr.3d *803 877 [mutual covenant held to be unenforceable].)
APS contends that section 7(e) should be excepted from section 16600 because it was part of a settlement agreement, but that fact is also irrelevant. "When a contract creates an illegal restraint on trade, `[t]here is nothing which the parties to the action could do which would in any way add to its validity. If the contracts upon which the judgment is based are to that extent void, they cannot be ratified either by right, by conduct or by stipulated judgment.'" (South Bay Radiology Medical Associates v. Asher (1990) 220 Cal.App.3d 1074, 1080, 269 Cal. Rptr. 15; see also Union Collection Co. v. Buckman (1907) 150 Cal. 159, 164-165, 88 P. 708 [court will not enforce illegal contract even if party against whom relief is sought expressly consents].)

C. Enforceability of Section 7(e)

Section 7(e) is unenforceable under sections 16601 and 16602 because it operates as a restraint of trade even if APS ceases doing business as a merchant service provider. Under section 16601, sellers of a business or its goodwill may agree not to compete with the buyer provided, among other things, the buyer "carries on a like business." Likewise, under section 16602, a partner may, upon dissolution of the partnership or upon his or her disassociation from the partnership, agree not to pursue a business similar to that of the partnership provided, among other things, that another partner or his or her successor in title "carries on a like business." Under section 7(e), APS is entitled to any residuals defendants receive on the retained accounts for a period of five years whether or not APS continues to carry on a like business during that period. Accordingly, a condition for enforceability of section 7(e) under sections 16601 and 16602 was not satisfied.
APS requests that a staying-in-business requirement be read into section 7(e) to preserve the benefit of the bargain it sought to obtain. "Courts have `blue penciled' noncompetition covenants with overbroad or omitted geographic and time restrictions to include reasonable limitations," but have otherwise declined to "strike a new bargain for the parties." (Strategix, Ltd. v. Infocrossing West, Inc. (2006) 142 Cal.App.4th 1068, 1074, 48 Cal. Rptr.3d 614; see also Hill Medical Corp. v. Wycoff, supra, 86 Cal.App.4th at p. 908, 103 Cal.Rptr.2d 779.) We likewise decline to rewrite section 7(e) here.[9]

D. Enforceability of Section 7(d)

Section 7(d) prohibits each of the parties from soliciting the other's accounts "for the purpose of suggesting or causing the transfer" of the accounts "away from" the other party. An account could not be transferred away from a party unless that party was continuing to service the account. Thus, section 7(d), unlike section 7(e), implicitly includes a staying-in-business requirement and satisfies that condition for enforceability under sections 16601 and 16602. As we explain below, we agree with the trial court that the other section 16602 conditions for enforcement of section 7(d) were met, and thus need not decide whether section 16601 might also apply. Joyce and Walczer as partners agreed on dissolution not to carry on a similar business as to certain accounts within a known geographic area where as partners they had transacted business.
*804 The new trial order rested on a "factual finding based upon evidence at the trial that during the time Joyce and [Walczer] worked together they functioned as `partners'...." "A partnership is defined by statute, as it was at common law, as an association of two or more persons to carry on as co-owners a business for profit (Corp.Code, § 16202, subd. (a))...." (Persson v. Smart Inventions, Inc. (2005) 125 Cal.App.4th 1141, 1157, 23 Cal.Rptr.3d 335.) "Generally, a partnership connotes co-ownership in partnership property, with a sharing in the profits and losses of a continuing business." (Chambers v. Kay (2002) 29 Cal.4th 142, 151, 126 Cal.Rptr.2d 536, 56 P.3d 645; but see Holmes v. Lerner (1999) 74 Cal.App.4th 442, 445, 88 Cal. Rptr.2d 130 [an express agreement to divide profits is not an absolute prerequisite].) "[I]t is well settled that the existence of a partnership is a question of fact." (Persson v. Smart Inventions, Inc., supra, 125 Cal.App.4th at p. 1157, 23 Cal. Rptr.3d 335.) The issue is ultimately one of the parties' intent, as shown by their agreements, their conduct, and the surrounding circumstances. (Holmes v. Lerner, supra, 74 Cal.App.4th at p. 454, 88 Cal.Rptr.2d 130.) The trial court's finding that a partnership existed must be upheld if it is supported by substantial evidence. (Cochran v. Board of Supervisors (1978) 85 Cal.App.3d 75, 81, 83, 149 Cal.Rptr. 304.)
Substantial evidence of a partnership between Joyce and Walczer was presented in this case. To begin with, the parties' intent is ascertained primarily from the terms of their written agreement when one exists (Security Pac. Nat. Bank v. Matek (1985) 175 Cal.App.3d 1071, 1075, 223 Cal. Rptr. 288), and Joyce and Walczer's May 1998 agreement expressly provided for the creation of a "joint venture"  the equivalent of a "partnership" in this context. There are distinctions between a partnership and a joint venture (see Chambers v. Kay, supra, 29 Cal.4th at p. 151, 126 Cal. Rptr.2d 536, 56 P.3d 645 [a joint venture "is usually formed for a single business transaction or enterprise"]; Rickless v. Temple (1970) 4 Cal.App.3d 869, 893, 84 Cal.Rptr. 828 [a joint venture is generally "more limited in both scope and duration" than a partnership]), and the name the parties give to their relationship is not necessarily controlling (see Greene v. Brooks (1965) 235 Cal.App.2d 161, 166, 45 Cal.Rptr. 99 [it is "immaterial that the parties do not designate the relationship as a partnership"]; Corp.Code, § 16202, subd. (a) [partnership may be formed "whether or not the persons intend to form a partnership"].) But it is probative that the parties called their arrangement a joint venture because joint venturers, like partners, "associate together as co-owners of a business enterprise" (Rickless v. Temple, supra, 4 Cal.App.3d at p. 893, 84 Cal. Rptr. 828) and, "[f]rom a legal standpoint, both relationships are virtually the same" (Weiner v. Fleischman (1991) 54 Cal.3d 476, 482, 286 Cal.Rptr. 40, 816 P.2d 892; see, e.g., Mashon v. Haddock (1961) 190 Cal.App.2d 151, 165-166, 11 Cal.Rptr. 865 [rights and liabilities of joint venturers as between themselves are generally the same as those of partners].)
The parties continued to refer to themselves as partners or joint venturers throughout their relationship. Malley testified that Walczer held herself out as a partner in APS when she approached him to join the business. In October 1999, Joyce wrote a letter at Walczer's request acknowledging that they had created a partnership. When Walczer sued Joyce in 2002, she alleged that she and Joyce had entered into "a joint venture agreement for the conduct of the business of APS," and that "the assets of the joint venture are in APS and the business conducted by APS." The settlement agreement described the suit as one in which Walczer sought "to establish that a joint venture *805 was created between her and Joyce and a dissolution of the joint venture...." At trial, Walczer testified that she and Joyce had originally agreed to "form a joint venture or partnership." The trial court could credit how these intelligent and experienced business persons characterized their relationship.
The trial court could also reasonably find that the reality of the parties' bargain matched their rhetoric. Actions speak as loudly as words. The May 1998 agreement provided that "[a]t such time as Lis personally and the efforts [of] sales personnel hired by her and for which she is responsible, begin to contribute to corporate profits, her percentage of ownership shall increase accordingly. At the end of every quarter the residual revenue stream shall be reviewed and a percentage of ownership for Lis will be determined by the percentage of revenue generated by her as a percentage of the total...." The agreement thus contemplated that Walczer would be more than an employee; she would become an owner to the extent of her contribution to the revenue of the business, and, eventually, a 50 percent owner when her residual revenue reached the target amount. Although she never received any shares in the corporation, she was treated as a co-owner at least by the time she met the revenue target in 1999. Joyce testified that, at that point, he considered her to be a 50 percent owner who "could have taken whatever she wanted" out of the business. There was thus substantial evidence of the essential element of co-ownership.
The evidence supplied substantial proof of joint management and control of the business, another feature of the partnership relation. (Estate of Foreman (1969) 269 Cal.App.2d 180, 189, 74 Cal.Rptr. 699 [a "degree of participation by partners in management and control of the business is one of the primary elements of partnership"]; Greene v. Brooks, supra, 235 Cal. App.2d at p. 166, 45 Cal.Rptr. 99 [same].) The May 1998 agreement stated that Joyce and Walczer "will consult each other on all business activities and no decisions shall be made without the approval of the other." Again, this provision is indicative of something more than an employer-employee relationship. The parties did not always confer and agree on business matters as their relationship deteriorated, but the evidence shows that they each exercised considerable control over the business at various times. At the outset, Joyce controlled the bank account and paid Walczer. Later, Walczer controlled the account and paid Joyce.
The trial court could further find that the antisolicitation covenants were imposed upon dissolution of a partnership, or disassociation of a partner from the partnership, as required by section 16602. Defendants argue that "the trial court's ruling was based on the misconception that Walczer and APS were partners" (italics added), but, as noted above, the new trial order referred to a partnership between Walczer and Joyce. As for that partnership, defendants assert without elaboration or citation to the record that "Walczer and Joyce dissolved their partnership approximately 19 months before the settlement agreement." (Italics in original.) But while Joyce and Walczer had by the start of 2001 agreed to go their separate ways, they did not reach any agreement to dissolve their business or disassociate until their settlement in mid-2002. During that interval, the parties communicated about a prospective dissolution and disassociation: Joyce's January 14, 2002, letter referring to "a point [in the future] whereby our dissolution is on course to be amicably resolved"; Walczer's April 19, 2002, letter lamenting that it had proven to "be this difficult to separate our business"; and Joyce's April 28, 2002, letter noting that *806 they had "spent over one year discussing the termination of whatever it was we had together." Plainly, the partnership had not been terminated and the parties had not separated their business when these letters were written. Moreover, as recited in the settlement, the agreement among other things resolved a lawsuit in which Walczer sought "a dissolution of the joint venture." The settlement effected that dissolution and the disassociation of the partners, and neither of those events occurred until the settlement was struck.
Defendants contend that this case is indistinguishable from Brockman v. Lane (1951) 103 Cal.App.2d 802, 230 P.2d 369 (Brockman), but we disagree. The plaintiff in Brockman contracted with the defendants to manage the development and farming of land purchased by defendants, in return for a monthly draw and an equal division of profits remaining after repayment of capital the defendants advanced. (Id. at pp. 802-803, 230 P.2d 369.) The court found that the plaintiffs "share of the profits ... was only ... compensation for his services" (id. at p. 805, 230 P.2d 369), and concluded that the plaintiff was the defendants' employee, not their partner.
Brockman merely illustrates that a profit sharing agreement does not invariably create a partnership. The decisive factor in Brockman was that the defendants retained ownership of the land and improvements, and "ran all the risk of loss." (Brockman, supra, 103 Cal.App.2d at p. 805, 230 P.2d 369.) Here, Walczer risked losses. That prospect was confirmed by her April 19, 2002, letter to Joyce stating, "I documented all the debits for you and I still haven't been reimbursed.... Yet I'm still paying for all the expenses for all the merchants. Without being reimbursed for these costs, combined with supporting the office staff, not to mention the attorney's fees I've also incurred, I have run out of money." Walczer functioned as more than a mere employee of the business.
Defendants submit that APS cannot be treated as a partnership for purposes of section 16602 because it "cannot be both a corporation and a partnership," and "there is no such thing as a partnership in a corporation." (Italics in original.) Contrary to those broad assertions, cases have held that "[p]artners may, by agreement, continue their relations as copartners in conjunction with their relationship as stockholders of a corporation," and if the corporation is "formed `as a mere agency for more conveniently carrying out the agreements between' the ... partners," the law will "... `take cognizance of such dual relationship and deal with "the parties in the light of their agreement[s between themselves], independently of their incorporation" (Persson v. Smart Inventions, Inc., supra, 125 Cal.App.4th at p. 1158, 23 Cal.Rptr.3d 335.) However, we need not determine whether these authorities are applicable because defendants' argument misconceives APS's role in the case.
The partnership between Joyce and Walczer was a different, and larger, enterprise than APS, the corporation. It was a business that was carried on by Joyce and Walczer for a time as APS, the corporation, nominally owned by Joyce, and for a time as APS, the sole proprietorship, nominally owned by Walczer. The reality, as Walczer alleged in her lawsuit, was that she and Joyce were "owner[s] of the joint venture in the form of APS," and they are properly treated as such for purposes of section 16602. By the time of the settlement agreement, APS, the corporation, was not the entire business; it was simply the entity representing Joyce's share of the business, and as an entity "deriving title to the business or its goodwill from [a] member of the partnership" it had a protectable *807 interest under the terms of section 16602. For this reason, defendants' arguments that Joyce and APS "are separate and distinct," that "APS cannot pierce its own corporate veil to step into Joyce's shoes," and that "APS does not have standing to assert that Section 16602 applies to a relationship between Walczer and Joyce" are simply misplaced.
Defendants contend that section 7(d) is as a matter of law unenforceable under section 16602 because APS, the California corporation, transferred all of its assets to APS, a Nevada corporation, before entering into the settlement. But APS Nevada, like APS California, was an entity "deriving title to the business or its goodwill from [a] member of the partnership," and thus protectable under the statute. If APS California was no longer operating as a business when Walczer solicited retained accounts, then she might have a defense to the enforcement of section 7(d) under the terms of the settlement agreement, but that is a factual matter on which the record is unclear and one that cannot be resolved in this appeal.[10]
Defendants contend that section 7(d) is unenforceable because it is not limited in scope to the "specified geographic area where the partnership business has been transacted" as required by section 16602. However, such a limitation is implicit in the ban on soliciting specified merchants, with places of business known to the parties. (See Strategix, Ltd. v. Infocrossing West, Inc., supra, 142 Cal.App.4th at p. 1073, 48 Cal.Rptr.3d 614 [applying section 16601; ban against soliciting customers of former business satisfies requirement that noncompetition covenant be geographically limited].) Defendants observe that a merchant specific antisolicitation covenant such as 7(d) has no fixed boundary because the locations at which merchants operate can change, and the covenant by its terms would extend to any new locations. Defendants submit that, in this respect, "[t]he only way 7(d) falls under Section 16602 is if the Court rewrites it." As we have said, "courts will not strike a new bargain for the parties" (Strategix, Ltd. v. Infocrossing West, Inc., supra, 142 Cal.App.4th at p. 1074, 48 Cal. Rptr.3d 614) to "`save[ ]' an unenforceable noncompetition covenant by changing its basic subject matter" (id. at p. 1074, fn. 5, 48 Cal.Rptr.3d 614). However, they will sever overbroad geographic restrictions from covenants that are otherwise enforceable. (E.g., Swenson v. File (1970) 3 Cal.3d 389, 395, 90 Cal.Rptr. 580, 475 P.2d 852; Roberts v. Pfefer (1970) 13 Cal.App.3d 93, 98, 91 Cal.Rptr. 308.) Accordingly, the fact that the covenant could not be lawfully enforced as to accounts at new locations did not render the balance of the prohibition unenforceable.
Walczer and Joyce each knew the specific geographic location of their customers when they specified "transferred" and "retained" accounts in their settlement agreement. They geographically limited the scope of their competition to accounts whose addresses were known to them. We simply enforce the geographic restrictions *808 the parties bargained for after they settled and allocated the accounts of their dissolved partnership, assisted by counsel at arms length negotiations. Although the agreement did not use the verbatim language of section 16602, the narrower limitation of using referenced accounts with known locations produced the same result permitted by the section.

E. Evidence of Solicitation

In ordering a new trial on the alleged breach of section 7(d), the court rejected defendants' claim that there was no evidence that Walczer solicited any of the retained accounts, and APS's claim that solicitation of all of the retained accounts it lost should be inferred from the evidence that some were solicited. These contentions, renewed on appeal, are reviewed under the rules that a trial court "... `sits ... as an independent trier of fact'" in deciding a new trial motion, and its "factual determinations, reflected in its decision to grant the new trial, are entitled to the same deference that an appellate court would ordinarily accord a jury's factual determinations, [¶] ... The trial court ... is in the best position to assess the reliability of a jury's verdict and, to this end, the Legislature has granted trial courts broad discretion to order new trials." (Lane v. Hughes Aircraft Co. (2000) 22 Cal.4th 405, 412, 93 Cal.Rptr.2d 60, 993 P.2d 388.)
APS cites Morlife, Inc. v. Perry (1997) 56 Cal.App.4th 1514, 66 Cal.Rptr.2d 731 (Morlife), for its argument that Walczer should have been found to have solicited all of the retained accounts that moved to RPS. Morlife was an action for misappropriation of confidential customer information in violation of the Uniform Trade Secrets Act. The defendants in Morlife were former employees of the plaintiff company who solicited the company's customers after they left its employ. The defendants' argument that the "solicitation could only be established by direct evidence on a customer-by-customer basis" was rejected because "[i]t was reasonable for the court to infer from the testimony of some of [the plaintiffs] former customers and from the other evidence before the court that [defendants] engaged in a general pattern of solicitation." (Id. at p. 1527, 66 Cal. Rptr.2d 731.)
Here, unlike Morlife, there was testimony from some of the customers who moved that they were not solicited to do so. The question, in any event, is not whether the evidence might have supported a finding that Walczer solicited all of the retained accounts RPS obtained, it is whether the trial court, in its role as an independent trier of fact, could reasonably find otherwise. Since the evidence did not compel a finding that every one of the merchants who moved were solicited, we must uphold the trial court's determination.
The trial court's finding that there was enough evidence of solicitation to justify a new trial must also be affirmed. Viewed most favorably to the court's decision, the evidence supported its finding that the three accounts discussed in footnote 7 ante, at least, were solicited. Walczer notes that "[m]erely informing customers of one's former employer of a change of employment, without more, is not solicitation" (Aetna Bldg. Maintenance Co. v. West (1952) 39 Cal.2d 198, 204, 246 P.2d 11), but whether that was all Walczer ever told the merchants who moved to RPS is a credibility determination for the trier of fact. The record shows that in June 2002, a period covered by the settlement agreement, she was signing up merchants to transfer to RPS, and Joyce testified that she did not reveal before they entered into the settlement that she had already signed up retained accounts for RPS. Thus, although APS apparently abandoned before trial its cause of action for promissory *809 fraud, there were sufficient grounds to question Walczer's credibility.
The court did not abuse its discretion in ordering a new trial on the cause of action for breach of section 7(d).

III.
The order granting a new trial is affirmed with costs to defendants.
We concur: SWAGER, and MARGULIES, JJ.
NOTES
[1] All further statutory references are to the Business and Professions Code.
[2] Two of the letters immaterially varied the quoted language.
[3] Similar testimony was received from three other merchants whose accounts were transferred later.
[4] Section 16600 states: "Except as provided in this chapter, every contract by which anyone is restrained from engaging in a lawful profession, trade, or business of any kind is to that extent void."
[5] Section 16602 provides: "(a) Any partner may, upon or in anticipation of any of the circumstances described in subdivision (b), agree that he or she will not carry on a similar business within a specified geographic area where the partnership business has been transacted, so long as any other member of the partnership, or any person deriving title to the business or its goodwill from any such other member of the partnership, carries on a like business therein. [H] (b) Subdivision (a) applies to either of the following circumstances: [¶] (1) A dissolution of the partnership. [¶] (2) Dissociation of the partner from the partnership.''
[6] The judgment was subsequently amended to note that defendants had prevailed on their cross-compliant insofar as it sought a declaration that section 7(e) of the settlement agreement was unenforceable.
[7] At another point in its decision, the court mentioned evidence of solicitation of three or "perhaps five" accounts. The three accounts to which the court was referring were presumably the accounts APS identified in its arguments as having been directly solicited: Best Western (Walczer initiated a contact regarding the split-up of her business); Dave's Ski Shop (told them she could rewrite their contract to make her their representative); and Montclair Wines (told them there was a tug of war over their account). APS's opposition to the new trial motion also cited as evidence of solicitation the transfer applications Walczer prepared before signing the settlement agreement, and Walczer's statement to one of Gallup's merchants that she did not know who would be servicing the account after the split-up.
[8] Section 16601 provides: "Any person who sells the goodwill of a business, or any owner of a business entity selling or otherwise disposing of all of his or her ownership interest in the business entity, or any owner of a business entity that sells (a) all or substantially all of its operating assets together with the goodwill of the business entity, (b) all or substantially all of the operating assets of a division or a subsidiary of the business entity together with the goodwill of that division or subsidiary, or (c) all of the ownership interest of any subsidiary, may agree with the buyer to refrain from carrying on a similar business within a specified geographic area in which the business so sold, or that of the business entity, division, or subsidiary has been carried on, so long as the buyer, or any person deriving title to the goodwill or ownership interest from the buyer, carries on a like business therein.

"For the purposes of this section, `business entity' means any partnership (including a limited partnership or a limited liability partnership), limited liability company, or corporation. [H] For the purposes of this section, 'owner of a business entity' means any partner, in the case of a business entity that is a partnership (including a limited partnership or a limited liability partnership), or any member, in the case of a business entity that is a limited liability company, or any owner of capital stock, in the case of a business entity that is a corporation. [¶] For the purposes of this section, `ownership interest' means a partnership interest, in the case of a business entity that is a partnership (including a limited partnership a limited liability partnership), a membership interest, in the case of a business entity that is a limited liability company, or a capital stockholder, in the case of a business entity that is a corporation. [H] For the purposes of this section, `subsidiary' means any business entity over which the selling business entity has voting control or from which the selling business entity has a right to receive a majority share of distributions upon dissolution or other liquidation of the business entity (or has both voting control and a right to receive these distributions)."
[9] In view of our holding that section 7(e) is unenforceable as a matter of law, we need not reach defendants' argument that they were erroneously prevented from contesting that section through a claim for reformation based on an excusable mistake.
[10] Whereas section 7(d)(1) prohibits APS from soliciting any of the transferred accounts "away from Walczer or any other business created by her," section 7(d)(2) only prohibits Walczer from soliciting reserved accounts "away from APS," not any other business created by Joyce. APS is identified in the settlement agreement as a California corporation, and the court noted in the new trial order that the agreement had no provision "render[ing] it applicable to a successor in interest." The extent of APS California's operations in 2002 is unclear. On the one hand, Joyce testified that he transferred all of the assets of APS California to APS Nevada in December 2001; on the other hand, the June 2002 settlement agreement states that the retained accounts were "held by APS [California]."